UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| MAX WILSON,<br><br>        Plaintiff,<br><br>    v.<br><br>DELTA STAR, INC.,<br><br>        Defendant. | Case No. 21-cv-07326-LB<br><br>**ORDER DENYING MOTION FOR CLASS CERTIFICATION**<br><br>Re: ECF No. 76 |

**INTRODUCTION**

This is a putative class action brought by plaintiff Max Wilson against his former employer, defendant Delta Star, Inc., alleging wage-and-hour violations under California law.

The plaintiff, a non-exempt hourly employee who worked for Delta Star from approximately February 2017 to August 2021, moves for class certification under Fed. R. Civ. P. 23(b)(3) to certify nine subclasses of current and former non-exempt employees in California based on: (1) unlawful rounding of work hours to scheduled shift times; (2) automatic thirty-minute deductions for meal periods; (3) failure to provide full, uninterrupted thirty-minute meal breaks before the end of the fifth hour of work; (4) failure to include non-discretionary bonuses in the regular rate for overtime calculations; (5) failure to include non-discretionary bonuses in the regular rate for sick pay calculations; (6) failure to reimburse for necessary hand tools where employees earned less

ORDER – No. 21-cv-07326-LB

than twice the minimum wage; (7) failure to pay all wages due upon termination; (8) inaccurate wage statements; and (9) unfair competition under Cal. Bus. & Prof. Code § 17200 et seq. (UCL).[1]

The underlying claims are for (1) unpaid overtime, Cal. Lab. Code §§ 510, 1198, (2) unpaid meal period premiums, *id.* §§ 226.7, 512(a), (3) unpaid minimum wages, *id.* §§ 1194, 1197, (4) untimely final wages, *id.* §§ 201–02, (5) non-compliant wage statements, *id.* § 226(a), (6) unreimbursed business expenses, *id.* §§ 2800, 2802, and (7) unfair competition under the UCL.[2]

Delta Star opposes class certification, contending that (1) there is no uniform non-compliant policy or practice applicable classwide, (2) individualized inquiries predominate over common questions, (3) the plaintiff (a non-union employee) is atypical and inadequate to represent a class largely composed of union members covered by a collective bargaining agreement (CBA), and (4) certain claims — all but the rounding class — are preempted by collective-bargaining agreements and the Labor Management Relations Act (LMRA), 29 U.S.C. § 185.[3] The plaintiff responds that common questions of law and fact predominate, a class action is superior, he is typical despite his lack of union membership, and preemption is not appropriately considered at certification.[4]

 The court denies the motion to certify the class. The non-union plaintiff's claims are not typical of the class, who are union members.[5] Additionally, for union members (who comprise the majority of the putative class), LMRA preemption further bars certification of claims requiring CBA interpretation.[6]

---

[1] Mot. – ECF No. 76 at 1–2. Citations refer to material in the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Compl. – ECF No. 1 at 24–34 (¶¶ 43–100).

[3] Opp'n – ECF No. 84 at 9–32.

[4] Reply – ECF No. 90 at 7–21.

[5] At the hearing on December 18, 2025, the plaintiff offered that if the court denied class certification based on typicality issues between union and non-union members, that certification should at least be granted as to the non-union members. As this motion was premised on the plaintiff's representing the entire class, the court does not address the issue now. The parties may raise the issue later on fuller briefing.

[6] The court can decide the motion without addressing Delta Star's request to strike certain declarations cited by the plaintiff. Opp'n – ECF No. 84 at 14 nn.18–19.

STATEMENT

1. **Delta Star Handbooks and CBAs**

Union members at Delta Star are covered by a series of four sequential CBAs in effect during the proposed class period (signed in 2015, 2018, 2021, and 2024) between Delta Star and the International Brotherhood of Electrical Workers Local Union 1245. Approximately ninety percent of the putative class members are (or were) union members subject to those CBAs.[7] The plaintiff was never a union member. The CBAs contain detailed provisions governing wages, overtime, tool reimbursement, and a multi-step grievance procedure culminating in final and binding arbitration.[8] Delta Star maintains a California Employee Handbook stating that union employees should refer to the CBA for "more details on certain policies as these may differ from this employee handbook" and that the California handbook governs the putative class members' employment unless the CBAs outline a different policy.[9] Delta Star also maintains General Plant Rules addressing primarily safety and attendance policies and a Salaried Employee Handbook containing policies for hourly employees, including some policies for Delta Star's California location (DSW).[10]

2. **Schedules and Time Keeping**

From 2020 through October 2023, the shift schedule was 6:00 a.m. to 2:30 p.m., 2:30 p.m. to 11:00 p.m., 10:30 p.m. to 6:00 a.m., and 6:00 a.m. to 6:30 p.m. for the weekend shift.[11] In October 2022, the first shift changed to 5:00 a.m. to 1:30 p.m.[12] The meal breaks are 9:30 a.m. to 10:00 a.m. for the first shift, 6:30 p.m. to 7:00 p.m. for the second shift, and 2:00 a.m. to 2:30 a.m. for

---

[7] CBAs, Exs. 1–4 to Huynh Decl. – ECF No. 84-2 at 6–173.

[8] CBA, Ex. 1 to Huynh Decl. – ECF No. 84-2 at 13–14 (Grievance Procedure), 23–24 (Overtime and Premium Benefits), 25–27 (Hours of Work), 28 (Tools Reimbursement), 29–30 (Wages), 31–32 (Rates of Pay), 34 (Monthly Bonus).

[9] Cal. Emp. Handbook, Ex. 8 to Lux Decl. – ECF No. 75-4 at 242.

[10] Lux Decl. – ECF No. 76-1 at 5 (¶ 15); Emp. Pracs. Handbook, Ex. 10 to *id.* – ECF No. 75-4 at 253–60; Gen. Plant Rules, Ex. 9 to *id.* – ECF No. 75-4 at 248–51.

[11] Negrete Dep., Ex. 1 to Lux Decl. – ECF No. 76-1 at 14–16 (pp. 14:25–16:15).

[12] Hernandez Dep., Ex. 3 to Lux Decl. – ECF No. 76-1 at 104–06 (pp. 32:1–35:8).

the third shift.[13] Both union and non-union hourly employees work on the same schedules and have the same supervisors, job titles, and scheduled meal and rest breaks.[14] The 2024 CBA outlines the three shifts for hourly employees as: shift one between 5:00 a.m. and 4:30 p.m., shift two from 12:30 p.m. to 11:30 p.m., and shift three between 9:00 p.m. and 7:00 a.m.[15]

Delta Star's "Employment Practices Handbook (Salaried Employees)" states, "hourly employees must record time when they start and stop work for the day."[16] The General Plant Rules outline practices for employees punching timecards.[17] Delta Star's California Handbook states that employees "are expected to be at their desks or workstations at the start of their scheduled shifts, ready to work," and are "expected to report to work as scheduled, on time, and prepared to start work" and cannot be tardy.[18] An employee who punches in one minute after the scheduled shift time is tardy under Delta Star's policy.[19]

Since at least 2020, Delta Star has maintained a policy that hourly employees must clock in at a paper punch timeclock when they arrive at work and punch out when they leave for the day.[20] After punching in, hourly paid employees grab their tools, put on their personal protective equipment (including protective shoes, glasses, and hats), either communicate with supervisors regarding tasks for the day or look at the book listing daily tasks, and then work at their stations until break.[21] To be able to work, employees "need their tools" and to "wear at least some types of personal protective equipment."[22] Hourly employees punch in and out at a timeclock for their

---

[13] *Id*. at 107–08 (pp. 42:2–43:2); Negrete Dep., Ex. 1 to Lux Decl. – ECF No. 76-1 at 20 (p. 37:8–11).
[14] Negrete Dep., Ex. 1 to Lux Decl. – ECF No. 76-1 at 34–35 (pp. 88:8–89:8).
[15] 2024 CBA, Ex. 1 to Huynh Decl. – ECF No. 84-2 at 25–27 (Hours of Work).
[16] Emp. Pracs. Handbook, Ex. 10 to Lux Decl. – ECF No. 75-4 at 259 (p. 31).
[17] Lux Decl. – ECF No. 76-1 at 5 (¶ 14); Gen. Plant Rules, Ex. 9 to *id*. – ECF No. 75-4 at 248–51.
[18] Cal. Emp. Handbook, Ex. 8 to Lux Decl. – ECF No. 75-4 at 244–45 (pp. 26–27).
[19] Negrete Dep., Ex. 1 to Lux Decl. – ECF No. 76-1 at 46 (p. 152:6–22).
[20] *Id*. at 17–18 (pp. 32:17–33:14).
[21] *Id*. at 25–28 (pp. 65:20–66:23, 68:18–21, 69:9–22), 30–32 (pp. 72:3–18, 73:19–74:20, 74:17–20), 37 (pp. 102:16–103:21).
[22] *Id*. at 47 (p. 154:5–16).

shifts, but Delta Star uses the handwritten total time hours at the bottom of timecards for payroll and employees' standard shift schedules.[23]

Delta Star prohibits any off-the-clock work.[24] The Employee Practice Handbook instructs Delta Star employees on accurate timekeeping and to discuss payroll discrepancies with their supervisor.[25] Delta Star maintains pay data for all putative class members electronically and has maintained time data for all putative class members since approximately 2021 or 2022.[26] Delta Star maintains physical timecard records at its San Carlos, California facility from 2017 onward.[27]

### 3. Meal Breaks

The California Employee Handbook states that California employees are covered by the rest period provisions of the Industrial Welfare Commission Wage Orders.[28] The Salaried Employee Handbook addresses Delta Star's meal policy for DSW, which states that "[n]on-exempt employees must take a mandatory unpaid 30-minute meal period no later than the end of the employee's fifth hour of work. Employees may not perform any work during this mandatory meal period. . . . Employees must punch out for their meal periods."[29] The policy does not reference payment of premium wages for meal breaks not provided. It also states that "[e]mployees are expected back at their work station ready to start work at the end of each scheduled break and/or lunch period."[30]

---

[23] Della Penna Dep., Ex. 2 to Lux Decl. – ECF No. 76-1 at 78–80 (pp. 73:21–24, 79:2–80:5), 83 (p. 94:10–13).

[24] Emp. Pracs. Handbook, Ex. 5 to Huynh Decl. – ECF No. 84-2 at 204–05 (pp. 30–31); *see* Emp. Decls., Exs. 5, 14, 20 – ECF No. 84-1 at 34 (¶ 20), 83 (¶ 15), 117 (¶ 15), 142 (¶ 17).

[25] Emp. Pracs. Handbook, Ex. 5 to Huynh Decl. – ECF No. 84-2 at 30–31; *see* Tello Dep., Ex. 9 to Huynh Decl. – ECF No. 84-2 at 342–43 (pp. 24:18–25:4).

[26] Della Penna Dep., Ex. 2 to Lux Decl. – ECF No. 76-1 at 70–72 (pp. 49:18–50:6, 51:11–22).

[27] *Id.* at 69 (p. 46:1–11) 71 (p. 50:7-10).

[28] Cal. Emp. Handbook, Ex. 8 to Lux Decl. – ECF No. 75-4 at 245 (p. 27).

[29] Salaried Emp. Handbook, Ex. 10 to Lux Decl. – ECF No. 75-4 at 257 (p. 28).

[30] *Id.*

All hourly paid employees who stay on the premises for lunch breaks are subject to Delta Star's automatic deduction policy.[31] There are no written records of meal periods for hourly paid employees who stay on the premises.[32] There were about 480 instances of premium pay since February 2017.[33] Of the 231 employee records that Delta Star produced on May 22, 2023, eight of these records (3.46 percent) had a "MissedMealPrem" pay code.[34]

Delta Star uses a bell system that rings at the beginning of a break and one minute before a break ends.[35] Delta Star instructs employees to record their meal breaks on their timecards and to notify a supervisor, HR, or payroll if a meal or rest break is missed. It is Delta Star's policy to pay premium pay when notified of a missed break.[36]

### 4. Bonuses

Since at least 2015, Delta Star has paid its hourly paid manufacturing employees monthly bonuses at DSW based on gross sales calculations for the month.[37] "Gross sales" are based on revenue reported for a given month, as outlined in the CBAs, which is based on the transformers worked on by the manufacturing employees.[38] The bonus is based on predetermined objectives outlined in the CBAs and has been offered throughout the relevant time period and never taken

---

[31] Negrete Dep., Ex. 1 to Lux Decl. – ECF No. 76-1 at 33 (p. 78:1–25), 36 (p. 90:4–15) ("Q: Okay. For the hourly paid employees who stay at the facility for lunch breaks, does Delta Star just automatically take out 30 minutes for a lunch break from their time? A: Yes. Q: And the automatic deduction practice, it's applicable to all employees, meaning union or nonunion, who stay on the premises for lunch breaks; is that a fair statement? A: Yes.").

[32] *Id.* at 42 (p. 139:14–20).

[33] Della Penna Dep., Ex. 2 to Lux Decl. – ECF No. 76-1 at 75 (p. 55:10–15).

[34] Lux Decl. – ECF No. 76-1 at 5–6 (¶¶ 16, 20); Time Rs., Ex. 12 to *id.* – ECF No. 75-4 at 270–320.

[35] Negrete Dep., Ex. 8 to Huynh Decl. – ECF No. 84-2 at 327 (p. 34:18–20), 332–34 (pp. 80:23–82:12).

[36] Della Penna Dep., Ex. 10 to Huynh Decl. – ECF No. 84-2 at 350–56 (pp. 57:18–24, 58:4–15, 59:2–19, 61:21–63:7, 63:10–21, 68:7–22).

[37] Della Penna Dep., Ex. 2 to Lux Decl. – ECF No. 76-1 at 60–64 (pp. 31:8–32:5, 32:23–33:6, 38:22–39:7).

[38] *Id.* at 84–86 (pp. 113:25–114:18, 114:25–115:8); CBAs, Exs. 5–7 to Lux Decl. – ECF No. 75-4 at 124–237.

away from manufacturing employees.[39] Delta Star did not calculate bonuses into the regular rate of pay for overtime or sick pay.[40] The plaintiff never became part of the union, but he was eligible for and received four of these manufacturing bonuses.[41]

### 5. Tool Reimbursement

The 2021 and 2024 versions of the CBA include tool reimbursement provisions stating that Delta Star will replace damaged tools required to perform work within an employee's job classification up to $350 in 2021 and $500 in 2024.[42] If an employee lacks a necessary tool, the employee may request that a supervisor either approve purchase of the tool or order it directly and submit a receipt for reimbursement.[43]

### 6. Procedural History

The court has federal-question and diversity jurisdiction. 28 U.S.C. §§ 1331–32. All parties consented to magistrate-judge jurisdiction.[44] *Id.* § 636(c). The court held a hearing on December 18, 2025.

## ANALYSIS

Class actions are governed by Federal Rule of Civil Procedure 23. A party seeking to certify a class must prove that all the prerequisites of Rule 23(a) are met, as well as those of at least one subsection of Rule 23(b) (here, Rule 26(b)(3)).

The prerequisites of Rule 23(a) are: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses

---

[39] Della Penna Dep., Ex. 2 to Lux Decl. – ECF No. 75-4 at 63 (pp. 38:22–39:7), 86–88 (pp. 115:14–117:7).

[40] *Id.* at 65 (p. 42:2–8), 68 (p. 45:9–16), 81 (p. 86:10–22).

[41] Personnel File, Ex. 13 to Lux Decl. – ECF No. 75-4 at 321–511.

[42] 2024 CBA, Ex. 1 to Huynh Decl. – ECF No. 84-2 at 28 (p. 23); 2021 CBA, Ex. 7. to Lux Decl. – ECF No. 75-4 at 222.

[43] Negrete Dep., Ex. 8 to Lux Decl. – ECF No. 75-4 at 24–25 (pp. 64:7–64:19).

[44] Consents – ECF Nos. 7, 9.

of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

A court may certify a class under Rule 23(b)(3) if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

"[P]laintiffs wishing to proceed through a class action must actually *prove* — not simply plead — that their proposed class satisfies each requirement of Rule 23, including (if applicable) the predominance requirement of Rule 23(b)(3)." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011)); *Comcast Corp. v. Behrend*, 569 U.S. 27, 32–33 (2013)). "[C]ertification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23[] have been satisfied." *Comcast*, 569 U.S. at 33 (cleaned up). "Such an analysis will frequently entail overlap with the merits of the plaintiff's underlying claim." *Id.* at 33–34 (cleaned up). "That is so because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* at 34 (cleaned up). Still, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). "Merits questions may be considered to the extent — but only to the extent — that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.*

Delta Star contends that the plaintiff's motion should be denied because (1) the plaintiff has not identified a common policy supporting the proposed subclasses, (2) all proposed classes fail for lack of typicality and adequacy because the plaintiff is not a union member when ninety percent of class members are, (3) all proposed classes lack commonality and individual issues predominate, (4) all but the rounding class are preempted by the CBA or § 301 of the LMRA, (5) the derivative claims fall with the others, and (6) a class action is not a superior method for adjudicating this dispute.[45]

---

[45] Opp'n – ECF No. 84.

The plaintiff responds that he meets the typicality and adequacy requirements (despite his lack of union membership) because all Delta Star employees are subject to the same policies, that he has satisfied the commonality, predomination, and superiority requirements by identifying common policies affecting all class members, and that preemption is not an appropriate consideration at the certification stage.[46]

### 1. Typicality — Rule 23(a)(3)

This motion turns on whether the plaintiff, as a non-union member, asserts claims typical of a class with ninety percent union membership. He does not. Accordingly, the court denies certification of all subclasses.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." "The test of typicality serves to ensure that the interest of the named representative aligns with the interests of the class." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1141 (9th Cir. 2016) (cleaned up). "Under the Rule's permissive standards, representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Id.* (cleaned up). "In this context, typicality refers to the nature of the claim or defense and not to the specific facts from which it arose or the relief sought." *Id.* (cleaned up) "Measures of typicality include whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id.* (cleaned up). Put another way, "[t]ypicality is present 'when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove

---

[46] Reply – ECF No. 90. The plaintiff does not dispute that ninety percent of putative class members are union members.

the defendants' liability.'" *Cal. Coal. for Women Prisoners v. United States*, 723 F. Supp. 3d 712, 730 (N.D. Cal. 2024) (quoting *Rodriguez v. Hayes*, 591 F.3d 1105, 1122 (9th Cir. 2010)).

Rule 23(a)(4) requires that "the representative parties [] fairly and adequately protect the interests of the class." "This adequacy requirement . . . 'serves to uncover conflicts of interest between named parties and the class they seek to represent' as well as the 'competency and conflicts of class counsel.'" *Espinosa v. Ahearn (In re Hyundai and Kia Fuel Econ. Litig.)*, 926 F.3d 539, 566 (9th Cir. 2019) (en banc) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625, 626 n.20 (1997)). "To determine legal adequacy, [courts] resolve two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Id.* (cleaned up).

"The adequacy-of-representation requirement 'tends to merge' with the commonality and typicality criteria of Rule 23(a)." *Gaudin v. Saxon Mortg. Servs., Inc.*, 297 F.R.D. 417, 425 (N.D. Cal. 2013) (cleaned up) (quoting *Amchem Prods.*, 521 U.S. at 626 n.20).

Delta Star asserts that the plaintiff fails to meet the typicality and adequacy requirements because ninety percent of putative class members are union members — whose dispute resolution processes, wages, hours, meal periods, and tool reimbursement are governed by a CBA — and the plaintiff is a non-union member — whose employment is governed by the California Labor Code and IWC Wage Orders.[47] The plaintiff counters that his claims are typical of the class because all Delta Star employees (regardless of union membership) are subject to the same policies and have the same schedules, meal breaks, job titles, supervisors, and timekeeping method.[48]

Because the plaintiff was never covered by a CBA, he can pursue his state claims without first exhausting the CBA's mandatory grievance and arbitration provisions. His claims are not typical of those he seeks to represent: ninety percent of the class is bound by those mandatory processes.[49]

---

[47] Opp'n – ECF No. 84 at 11–13.

[48] Reply – ECF No. 90 at 19–21.

[49] *Id.*; Opp'n – ECF No. 84 at 12–13, 22–23, 30 (making this point).

This creates unique defenses applicable only to union members — including failure to exhaust and LMRA § 301 preemption — that do not apply to the plaintiff. *See Burnside v. Kiewit Pac. Corp.*, 491 F.3d 1053, 1059–60 (9th Cir. 2007) (LMRA preemption when court must construe a provision of the CBA, either because the claim is founded directly on rights created by the CBA or is substantially dependent on analysis of it); *Dent v. Nat'l Football League*, 902 F.3d 1109, 1116–17 (9th Cir. 2018) (same); *Abdul-Baaqiy v. Fed. Nat'l Mortg. Ass'n*, 149 F. Supp. 3d 1, 10 (D.D.C. 2015) (striking class allegations because "a plaintiff's claims are not typical of a potential class when the plaintiff is not required to arbitrate but potential class members are"); *Quinlan v. Macy's Corp. Servs.*, Civ. No. 12-00737DDP, 2013 WL 11091572, at *3 (C.D. Cal. Aug. 22, 2013) (the plaintiff was atypical of the class because he was a union member and not required to arbitrate, while class members were non-union and subject to mandatory arbitration).

The cases cited by the plaintiff do not alter the result. In *Amalgamated Transit Union Local 1309, AFL-CIO v. Laidlaw Transit Services*, the typicality analysis focused on how the plaintiff's status as an assignee affected certification and only commented that there was no material distinction between union and non-union members in discussing whether there was a conflict of interest, not assessing typicality of claims. No. 05cv1199-IEG-CAB, 2009 WL 249888, at *4 (S.D. Cal. Feb. 2, 2009). The court in *California State Employees' Ass'n v. California* decided that the presence of union and non-union members in a single class did not defeat certification where commonality and typicality were met but did not address a situation where one set of class members were subject to grievance and arbitration procedures and others were not. No. C-84-7275-MHP, 1985 U.S. Dist. LEXIS 15974, at *35–37 (N.D. Cal. Sept. 13, 1985). The plaintiff attempted to distinguish *Morgan v. Rohr, Inc.* — which determined that union members could not represent non-union members because they were subject to different policies for meal breaks, rest breaks, and time recording — but as in *California State Employees' Ass'n*, the court did not address how policies requiring a grievance process or arbitration by only part of a class affected typicality. No.: 20-cv-574-GPC-AHG, 2022 WL 974334, at *6 (S.D. Cal. Mar. 31, 2022).

The same union/non-union divide defeats adequacy under Rule 23(a)(4). A class representative who faces materially different legal obstacles than the absent class members he seeks to represent

cannot adequately protect their interests. *See In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 566–67 (9th Cir. 2019) (en banc).

To the extent that the plaintiff contends that any consideration of the effect of the CBA on certification is improper as going to the merits, courts may consider merits issues that are relevant to assessing whether Rule 23 is satisfied, and the CBAs are relevant here.[50]

**2. Preemption**

The defendant contends that certification of the plaintiff's classes for automatic deduction of meal breaks, regular rate calculations, and tool reimbursement are preempted by either the CBA or LMRA.[51] The plaintiff responds that his claims do not depend on the CBA and preemption goes to the merits, which is inappropriate to consider at the class-certification stage.[52] For now, the court foregoes assessing preemption, which is better addressed on full briefing. While preemption may create additional individualized issues or unique defenses for union members, potentially defeating predominance and typicality, the court need not resolve it here given the typicality holding. *Amgen*, 568 U.S. at 466 (merits inquiries limited to those relevant to Rule 23).

# CONCLUSION

Because the plaintiff does not meet the typicality requirement, the court denies the motion for class certification. This resolves ECF No. 76.

**IT IS SO ORDERED.**

Dated: December 18, 2025

LAUREL BEELER
United States Magistrate Judge

---

[50] Reply – ECF No. 90 at 18–19.

[51] Opp'n – ECF No. 84 at 22–23, 26–27, 30.

[52] Reply – ECF No. 90 at 18–19.